Evelyn L. BARNES, t/a Triangle Gulf, Appellant,

v.

GULF OIL CORPORATION, Anderson Oil Company, Inc., Vernon H. Anderson and Betty W. Anderson, Appellees.

Service Station Dealers of America, Inc., Amicus Curiae.

No. 85–1851.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1986.

Decided July 8, 1986.

---

Ronald M. Pearce (Richard M. Bing, Pearce & Bing, Richmond, Va., on brief) for appellant.

Robert S. Bassman (Douglas B. Mitchell, Bassman, Mitchell & Alfano, Washington, D.C., on brief) for appellees Anderson Oil Co., Inc., and Vernon H. and Betty W. Anderson.

R.S. Henderson (Waller T. Dudley, Boothe, Pritchard & Dudley, Alexandria, Va., on brief) for appellee Gulf Oil Corp.

Dimitri G. Daskal, on brief, for amicus curiae.

Before RUSSELL and HALL, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

Evelyn L. Barnes appeals the judgment of the district court dismissing her complaint. Barnes alleges that Gulf Oil Corporation terminated her service station franchise by assigning Gulf's interest to Anderson Oil Co. and selling the premises to Vernon H. Anderson and Betty W. Anderson in violation of Title I of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2806 (1982). The primary issue is whether the assignment of a franchise that increases the retailer's cost of gasoline over the franchise's stipulated price gives rise to a cause of action against the refiner under the Act. This issue divides two district courts, and no court of appeals appears to have decided it.[1] We conclude that such an assignment affords the retailer a cause of action. We vacate the judgment of the district court and remand the case for further proceedings.

I

Barnes has operated a service station since September 1, 1979, pursuant to a series of franchise agreements with Gulf.

---

1. *Compare Aldrich v. Amoco Oil Co.,* 2 Business Franchise Guide (CCH) ¶ 8322 (S.D. Iowa Jan. 7, 1985) (franchisee has no federal cause of action) *with Hodge v. Texaco, Inc.,* No. 81–228–RE (D.Ore. June 4, 1982) (unpublished) (franchisee has cause of action).

Barnes's initial franchise agreement expired on August 30, 1980. This agreement was renewed for a two-year period that ended on August 31, 1982. The agreement was subsequently extended for a three-year period ending on August 31, 1985. Prior to May 6, 1985, Barnes leased her service station premises from Gulf.

Barnes alleges that on May 6, 1985, Gulf terminated her franchise by assigning its interest in the franchise agreement to Anderson Oil. Gulf also sold the premises to Vernon H. Anderson and Betty W. Anderson subject to Barnes's right of occupancy pursuant to the franchise agreement. Barnes complains that Gulf did not notify her of its decision to assign the franchise agreement and sell the premises and that Gulf did not offer to sell the premises to her. Barnes also contends that the assignment was invalid under Virginia law and that the invalid assignment terminated the franchise.

Barnes filed an affidavit setting forth facts supporting her allegations. Gulf and Anderson answered the complaint and filed motions to dismiss for failure to state a claim. At the hearing on the motions, the parties and the court referred to the uncontradicted facts set forth in Barnes's affidavit.[2] By considering Barnes's affidavit, the district court, without objection by any party, treated the motions to dismiss as motions for summary judgment. *See* Fed.R. Civ.P. 12(b).

The district court held that the assignment and sale did not terminate the franchise because Barnes was still in business as a Gulf retailer. It also held that the assignment did not violate Virginia law. It

granted the motions filed by Gulf and Anderson.

## II·

Congress enacted Title I of the Act in response to widespread terminations and nonrenewals of the franchises of independent gasoline retailers and distributors. It was concerned about the "[n]umerous allegations ... that terminations and non-renewals, or threats of termination or non-renewal, have been used by franchisors to compel franchisees to comply with marketing policies of the franchisor." S.Rep. No. 731, 95th Cong., 2d Sess. 17, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 876. Congress noted that such practices threaten "the independence of the franchisee as a competitive influence in the marketplace." S.Rep. No. 731, *supra,* at 18, U.S.Code Cong. & Admin.News 1978, p. 877. It acted to promote competition within the industry by protecting franchisees "from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. No. 731, *supra,* at 15 U.S.Code Cong. & Admin. News 1978, p. 874; *see also Kostantas v. Exxon Co., U.S.A.,* 663 F.2d 605, 606 (5th Cir.1981); Comment, *Judicial Interpretation of the Petroleum Marketing Practices Act: Conflict and Diversity,* 32 Emory L.J. 273, 279–83 (1983).

The Act defines a franchise in terms of three elements: a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold. *See* S.Rep. No. 731, *supra,* at 29; *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 n. 2 (7th Cir.1982).[3]

---

**2.** In their brief, Gulf and Anderson acknowledge:

> Moreover, in considering the motions to dismiss, the trial court had before it Mrs. Barnes' affidavit ... and was thus fully aware of the facts which are alleged to demonstrate a violation of Virginia law. And, it is clear from the transcript of those proceedings that Judge Bryan assumed these facts to be true. He concluded nevertheless that these facts failed to show any violation of state law.

**3.** Section 2801(1) provides:

(A) The term "franchise" means any contract—

> \* \* \* \* \* \*

(ii) between a refiner and a retailer,

> \* \* \* \* \* \*

under which a refiner ... authorizes or permits a retailer ... to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner.

(B) The term "franchise" includes—

The Act establishes "a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises and the notice which franchisors must provide franchisees prior to termination of a franchise." S.Rep. No. 731, *supra*, at 19, U.S.Code Cong. & Admin.News 1978, p. 877. Section 2802(b)(2) enumerates five circumstances under which a franchise may be terminated during its term. The Act prohibits any termination that is not based on one of these grounds. S.Rep. No. 731, *supra*, at 15. Gulf and Anderson do not contend that any of these grounds exist.

A franchisor may not terminate a franchise, notwithstanding the existence of one of the grounds described in the legislation, without first giving notice to the franchisee as provided by section 2804. *See Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1390–91 (10th Cir.1981). With certain exceptions, the franchisor must give the franchisee an opportunity to buy the premises if the franchisor decides to sell. *See* § 2802(b)(3)(D)(iii). Gulf concedes that notice was not given to Barnes, nor was Barnes given a right of first refusal for the premises.

Section 2805 provides that if a franchisor terminates a franchise in the absence of one of the grounds specified in the legislation, or if the franchisor fails to comply with the notice or right of first refusal requirements of the Act, the franchisee may bring an action against the franchisor for damages and other relief.

### III

▮ Barnes alleges that as a result of the assignment she no longer has any direct dealings with Gulf. Prior to the assignment, she bought her gasoline directly from Gulf. The franchise agreement expressly incorporated a contract for the supply of motor fuel that provided that Gulf would sell to Barnes at its dealer tank wagon price. Barnes alleges that she must now buy her gasoline from Anderson, which sells to her at a markup over Gulf's current tank wagon price. She states that the increased price amounts to $1,000 a month. As a consequence, she claims that she has been forced to raise her prices, and her sales and net income have declined.

Gulf admits that it contracted with Barnes to sell motor fuel at its dealer tank wagon price. With regard to the increased price for motor fuel that Barnes must pay Anderson, Gulf and Anderson point out that the contract defines the dealer's tank wagon price as the "seller's scheduled price in effect at time and for place of delivery." They contend that because Anderson, by reason of the assignment, is now the seller, Anderson is not obligated to deliver at Gulf's current dealer tank wagon price and that any effort by Gulf to make Anderson do so would violate federal antitrust laws. It is their position that Anderson can charge a higher price than Gulf's current dealer tank wagon price if Anderson acts in good faith.

Gulf also contends that even if Anderson improperly increased the cost of gasoline, Barnes has only a breach of contract action against Anderson. Gulf relies on *Aldrich v. Amoco Oil Co.*, 2 Business Franchise Guide (CCH) ¶ 8322, at 15,113 (S.D.Iowa Jan. 7, 1985), where the court held that the assignee's failure "to provide motor fuel at the dealer buying price may form the basis of a contract breach claim against [the assignee]. It does not, however, constitute a [Petroleum Marketing Practices Act] violation."

(i) any contract under which a retailer ... is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark ...

(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed ... and

(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

A contrary result was reached in *Hodge v. Texaco, Inc.,* No. 81–228–RE (D. Ore. June 4, 1982) (unpublished), where Texaco assigned its interest in Hodge's franchise to a distributor who increased the price of gasoline. The court denied Texaco's motion for summary judgment, stating:

> The Agreement of Sale ... is a franchise within the meaning of 15 U.S.C. § 2801(1)(A)(iv). The Agreement of Sale provides that Texaco will sell and Hodge will buy Texaco Skychief Gasoline and Texaco Fire Chief Gasoline at Texaco's "posted retailer tankwagon prices." As such, this is a contract "pertaining to the supply of motor fuel which is to be sold, consigned or distributed-... (I) under a trademark owned or controlled by a refiner ...." 15 U.S.C. § 2801(1)(B)(I).

Contrary to *Aldrich,* we conclude that Barnes's remedy is not confined to an action against Anderson. We agree with *Hodge* that the Act affords a remedy against the franchisor. The Act regulates the termination of "any contract pertaining to the supply of motor fuel." § 2801(1)(B)(ii). The Act protects the motor fuel contract because Congress recognized that in the absence of such protection, "the substantive provisions of the title, relating to the termination of a franchise ... may ... be circumvented by a termination or non-renewal of the ... motor fuel supply agreement which thereby renders the trademark license valueless." S.Rep. No. 731, *supra,* at 29, U.S.Code Cong. & Admin.News 1978, p. 888. The Act does not contemplate that a franchisee should be relegated to seeking damages from an assignee that might not have the resources to satisfy a judgment. A franchisor cannot circumvent the protections the Act affords a franchisee by the simple expedient of assigning the franchisor's obligation to an assignee who increases the franchisee's burden by charging more for gasoline than the stipulated franchise price.

The legislative history explains that even a valid assignment under state law may have to give way to the termination provisions of the Act:

> The preemption provisions of the legislation are limited to provisions of State law dealing with termination or nonrenewal of franchise relationships. The legislation is not intended to authorize or to prohibit franchise assignments; instead, as a general rule, assignability of franchises is a matter left to State law. However, there is an area in which Federal termination provisions under this legislation and State-granted rights of assignability of a franchise may conflict. It is intended that the harmonizing of these competing interests be left to judicial balancing of competing equities on a case-by-case basis. No hard and fast statutory rule would accomplish the desired goal of harmonizing the competing statutory objectives as equitably as application of general principles of equity to specific fact situations.

S.Rep. No. 731, *supra,* at 42–43, U.S.Code Cong. & Admin.News 1978, p. 901. This paragraph of the history contains two examples involving assignments that illustrate that neither a franchisee nor a franchisor may frustrate the federal statutory rights of the other. The legislative history continues:

> Many other examples within the extremes of the preceding illustrations may be postulated. It is clear that no single statutory principle would be flexible enough to deal with so wide a range of potential conflicts. Therefore, the legislation leaves to the courts the task of resorting to traditional principles of equity to maximize attainment of the competing statutory objectives consistently with the supremacy clause of the Constitution and the purposes of the Federal legislation.

S.Rep. No. 731, *supra,* at 43, U.S.Code Cong. & Admin.News 1978, p. 901.

The Act and the legislative history lead us to conclude that even if an assignment of the franchise is authorized by state law, the franchisee can obtain relief under the Act if the franchisee can no longer obtain gasoline at the stipulated franchise price. One of Congress's purposes in adopting the Act was to protect franchisees from overbearing, burdensome conduct by the franchisor during the term of the franchise.

*See* S.Rep. No. 731, *supra,* at 17–19; *Marini v. Atlantic Richfield Co.,* 475 F.Supp. 142, 144–45 (D.N.J.1979). Therefore, if Barnes can prove her allegations, Gulf has terminated her franchise, and she is entitled to relief.

### IV

■ Barnes also contends that the assignment of the franchise is invalid under Virginia law because the assignment has increased her burdens.[4] If the proof sustains her allegations, we conclude that this alternative theory of recovery also affords her relief under the Act.

Two provisions of the Act refer to the assignment of franchises. The definition of a franchise found in section 2801(1)(B) states:

> The term "franchise" includes—... (iii) the unexpired portion of any franchise ... which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

This definition is complemented by section 2806(b) which states:

> Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

Implicit in these provisions are the concepts that an assignment that is unauthorized by state law is prohibited and that the unexpired portion of a franchise that has been invalidly assigned is no longer a franchise as defined by the Act. An assignment that is invalid under state law because it increases the franchisee's burdens is tantamount to a constructive termination of the franchise.[5]

Barnes's primary complaint is that the assignment has increased the cost of her gasoline by $1000 a month over the price stipulated in the franchise.

Barnes also alleges that Anderson, which operates a service station four miles away, has ordered changes in the operation of the station that are detrimental to her business.[6] It has instructed Barnes to discontinue a car rental service that she operated on the station premises with the permission of Gulf's sales representative. This service provides Barnes with half of her income. Barnes is no longer permitted to allow a nearby church to park its buses at the gas station. Formerly, the church had its buses fueled and serviced at Barnes's station in return for this privilege. Anderson has indicated its intention to make changes in the operation of Barnes's muffler shop. It also refused to reimburse one of Barnes's customers for damage to his engine after water in one of the station's tanks was pumped into his car. Gulf used to provide such reimbursement.

Barnes also alleges that she no longer receives many of the services that Gulf used to provide. She specifically complains

---

4. Barnes relies upon Va.Code § 8.2–210(2) (1965) which provides:

> Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance.

5. Other courts have stated in dictum that overbearing conduct by the franchisor may constitute a constructive termination of the franchise. *See Smith v. Atlantic Richfield Co.,* 533 F.Supp. 264, 269 (E.D.Pa.), *aff'd,* 692 F.2d 749 (3d Cir. 1982); *Sexe v. Husky Oil Co.,* 475 F.Supp. 135, 137 (D.Mont.1979); *California Arco Distributors,*

*Inc. v. Atlantic Richfield Co.,* 158 Cal.App.3d 349, 365, 204 Cal.Rptr. 743, 754 (Cal.Ct.App. 1984). We agree that the Act applies to constructive terminations.

6. Prior to the assignment, Barnes had substantial control over the operation of the station pursuant to the following provision in the franchise: .

> Gulf is interested only in results in terms of increased volume of sales of Gulf's gasoline; and the means, methods and details are entirely within the discretion and judgment of the Dealer, who shall have entire charge and control of the management of his business in the accomplishment of said results.

of the loss of Gulf's marketing representative and image inspections, and Gulf's failure to furnish advertising materials, promotional items, and notice of its trade shows. Finally, Anderson has informed Barnes that it expects her to sell 50,000 gallons of gasoline per month although Barnes has never sold more than 40,000 gallons in a month.

These allegations of increased burdens may buttress Barnes's contention that Gulf terminated the franchise by making an assignment that is invalid under Virginia law. At this stage of the proceedings, Barnes is entitled to pursue this alternative theory of her case.

■ Apart from the alleged increase in the cost of gasoline, the allegations about the detrimental changes imposed by Anderson and the loss of Gulf's marketing services cannot be the basis of any monetary recovery under the Act. We base this conclusion on the definition of the term "franchise" in section 2801(1) and the legislative history which explains:

The term "franchise" is defined in terms of a motor fuel trademark license. . . . Secondary arrangements, such as leases of real property or motor fuel supply agreements, are incorporated in the definition of a franchise. Therefore, the substantive provisions of the title, relating to the termination of a franchise or non-renewal of the franchise relationship, may not be circumvented by a termination or non-renewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless. The broader definition, however, is not intended to encompass other contractual arrangements which may exist between a franchisor and a franchisee, *e.g.*, credit card arrangements, contracts relating to financing of equipment, or contracts for purchase and sale of tires, batteries, or automotive accessories.

S.Rep. No. 731, *supra*, at 29, U.S.Code Cong. & Admin.News 1978, p. 888. For this reason, the changes and perquisites that Barnes mentions differ from the motor fuel contract, which by statute and agreement is an integral part of the franchise.

Our conclusion that an assignment unauthorized by state law unlawfully terminates a franchise does not conflict with Congress's objective of establishing "a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises." S.Rep. No. 731, *supra*, at 19, U.S.Code Cong. & Admin.News 1978, p. 877. The Act expressly does not preempt state law with respect to assignments. *See* § 2806(b); S.Rep. No. 731, *supra*, at 42–43. Congress did not seek to establish uniform rules to determine whether an assignment is valid. The Act leaves the determination of this issue to state law. Recognition that an invalid assignment terminates the franchise satisfies the congressional objective of uniformity.

V

The judgment of the district court is vacated, and this case is remanded for proceedings consistent with this opinion. Barnes shall recover her costs.

VACATED AND REMANDED.

